**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| 1)  NATHANIEL DEWAYNE HARRIS | ) | |
| | ) | |
| Plaintiff, | ) | Attorney Lien Claimed |
| | ) | |
| v. | ) | Jury Trial Demanded |
| | ) | |
| 1) MIKE REED in his official capacity as Mayes | ) | Case No.: 24-cv-00241-CDL |
| County Sheriff; | ) | |
| 2) TURN KEY HEALTH CLINICS, LLC , | ) | |
| 3) JOHN BLACK, | ) | |
| 4) ALISHA JEAN LAWHORN, | ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT

**COMES NOW**, the Plaintiff Nathaniel Dewayne Harris ("Plaintiff" or "Mr. Harris")

and for his Complaint against the above-named Defendants, states and alleges as follows:

## PARTIES

1.      Plaintiff is an individual who resides in Locust Grove, Mayes County Oklahoma.

2.       Defendant Mike Reed ("Sheriff Reed" or "Sheriff") is the Sheriff of Mayes

County, Oklahoma, residing in Mayes County, Oklahoma and acting under color of state law.

The Sheriff is sued purely in his official capacity.  It is well-established, as a matter of Tenth Circuit

authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing

a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v.

Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir.

2014). Thus, in suing the Sheriff in his official capacity, Plaintiff has brought suit against the

County/Mayes County Sheriff's Office ("MCSO").The Sheriff is ultimately responsible for

ensuring the constitutional operation of the Mayes County Jail ("Jail").

3.      Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Mayes County, Oklahoma.  Turn Key is a private correctional health care company that contracts with counties, including Mayes County, to provide medical professional staffing, supervision and care in county jails. Turn Key was, at times relevant hereto, responsible, in part, for providing medical services, supervision and medication to Mr. Harris while he was in custody at the Jail.  Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees.  Turn Key was endowed by Mayes County/MCSO with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

4.      Defendant John Black ("Black") was, at all times relevant hereto, acting under color of state law as an employee and/or agent of  Mayes County/MCSO. Black was responsible, in part, for ensuring Mr. Harris' health and well-being, and assuring that his medical and safety needs were met, during the time he was in the custody of MCSO. Black is being sued in his individual capacity.

5.      Defendant Alisha Jean Lawhorn ("Nurse Lawhorn" or "Lawhorn") is a citizen of Oklahoma. Nurse Lawhorn was, at all times relevant hereto, acting under color of state law as an employee and/or agent of Turn Key/MCSO/Mayes County. Nurse Lawhorn was, in part, responsible for overseeing Mr. Harris' health and well-being, and assuring that Mr. Harris' medical/mental health needs were met, during the time he was in the custody of the Jail/Mayes County. Nurse Lawhorn is being sued in her individual capacity.

**JURISDICTION AND VENUE**

6.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure

2

protection of and to redress deprivations of rights secured by the Eighth and/or Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## **STATEMENT OF FACTS**

9.      Paragraphs 1-8 are incorporated herein by reference.

■ **Facts Specific to Mr. Harris**

10.      On May 20, 2022, Mr. Harris was pulled over in Locust Grove, Oklahoma for suspicion of driving while impaired. The perceived impairment was likely the result of Mr. Harris' medical conditions. The charge has since been dismissed in Cherokee Nation Court.

11.      This was Mr. Harris' first time being arrested.

12.      In any event, as a result of his arrest, Mr. Harris was transported to the Mayes County Jail.

13.      According to Locus Grove Police and MCSO records, Mr. Harris was detained beginning 7:24 p.m. and was booked into the Jail at approximately 9:21 p.m.

14.      Mr. Harris suffers from a life-threatening blood-clotting disorder and requires two daily doses of blood thinner medication, Eliquis. Eliquis is an anticoagulant/blood thinner medication used to treat and prevent blood clots and stroke in patients with nonvalvular atrial fibrillation.

15.     The night of the arrest, Mr. Harris' mother personally went to the Jail and informed Defendant Black, at detention officer at the Jail, that her son suffers from a blood clotting disorder and needed to take his Eliquis twice daily. Nonetheless, with deliberate indifference, Black did not ensure that Mr. Harris received his mediation as prescribed.

16.     In addition, Mr. Harris reported to the Turn Key nurse on duty that he "blood clots in both legs" and suffered from seizures. The night nurse charted that Harris brought his Eliquis to the Jail.

17.     At approximately 12:15 pm on May 21, 2022, Nurse Lawhorn filled out a "Medical Intake Form" for Mr. Harris. As part of the medical intake process, Mr. Harris notified Nurse Lawhorn that he suffers from a "blood clotting disorder" and "hypotension." Nurse Lawhorn further documented that Mr. Harris had a stroke in 2016. Lawhorn recommended that Harris be placed in medical housing due to his blood clotting disorder.

18.     Nurse Lawhorn additionally verified that Mr. Harris was prescribed Eliquis, 5mg two times a day for his blood clotting disorder. Mr. Harris' Eliquis was his most important medication and there is an entry under substitution of medicine for Eliquis Y (for yes) entry is "5-21-22 TORB Lawhorn, LPN (started)" TORB means telephone order read back.

19.     By the time of the medical intake, Mr. Harris was having pain and cramping which he feared to be associated with blood clots.

20.     With negligence and deliberate indifference, however, Nurse Lawhorn did not ensure that Mr. Harris received his Eliquis as prescribed.

21.     Nurse Lawhorn, like the other nurses at the Jail, is a Licensed Practical Nurse, or LPN. LPNs have about a year of nursing education, often culminating in a certificate. The role of an LPN is, as the name suggests, practical. Typical duties for which an LPN is qualified are: record a patient's health history; administer medications (under the supervision of an RN or physician);

perform wound care; measure and record vital signs; observe a patient's condition. "LPNs cannot diagnose any medical condition or prescribe any medication." *See* American College Health Association Guidelines February 2023. LPNs are expected to report even minor changes in patient care to a registered nurse or other medical professional. *See also, Estate of Jensen by Jensen v. Clyde*, 989 F.3d 848, 852 (10th Cir. 2021) ("An LPN designation does not require an associate's or bachelor's degree … [LPNs are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions.").

22.    By the morning of May 22, Mr. Harris was experiencing severe pain in his legs and pain in his chest. He was having difficulty standing and ambulating. He had labored breathing. He felt nauseous and weak.

23.    Mr. Harris notified the Turn Key nurse on duty that he was in severe pain, suffered from a blood clotting disorder and needed his medication. Harris also told the nurse that he was having difficulty standing, walking and breathing and felt nauseous. The Turn Key nurse provided no care and told Harris that he needed to get up and move around. The nurse accused Plaintiff of pretending to be ill so he could get out on an "own recognizance" bond. This constitutes negligence and deliberate indifference.

24.    On the evening of May 22, Mr. Harris' condition had worsened. Harris stated to Defendant Black: "Something is wrong with me." Black ordered Mr. Harris to stand up. Black observed Mr. Harris struggle to stand and wincing in pain. Harris further told Black that he was suffering in severe pain and could not walk. The pain was all over his body. His shortness of breath was audible. He again asked for his medication. Another inmate told Black that Harris was sick and needed medical attention. Black simply shrugged and left the pod. This constitutes deliberate indifference to a serious medical need.

25.     Throughout the night of May 22, Mr. Harris' condition deteriorated. He was concerned that he would die in the Jail. He continued to complain to MCSO staff and Turn Key staff that he needed immediate medical attention. Those complaints were disregarded.

26.     On the morning of May 23, Mr. Harris' shortness of breath had worsened. He could barely move. His pain was excruciating. He told the Turn Key nurse on duty of his worsening symptoms. He begged for medical attention. The nurse asked Mr. Harris if he was gay. Mr. Harris replied, "yes." The Turn Key nurse did not even take Mr. Harris' vital signs, did not call a physician, did not call 911, and provided no care at all. This was negligence and deliberate indifference.

27.     At around 1:30pm on May 23, 2022, Mr. Harris bonded out of the Jail.

28.     While Mr. Harris should have received 8 doses of Eliquis during his time in the Jail, he only received two doses.

29.     Upon release from the Jail, Mr. Harris immediately went to the ER where he was diagnosed with an embolism and new blood clot in his lung.

30.     The lung embolism and a new blood clot were a directly and proximately caused by Defendants' deliberate indifference and negligence.

■ **The Jail's and Turn Key's Policy and Custom of Inadequate Medical Care**

31.     Paragraphs 1-30 are incorporated herein.

32.     There is an affirmative link between the unconstitutional acts and/or omissions of employees or agents of the County/MCSO/Turn Key, as described *supra*, including Defendant Black, Nurse Lawhorn, and the other Turn Key nurses on duty, and policies, practices and/or customs which the County/MCSO/Turn Key promulgated, created, implemented and/or possessed responsibility for.

33.     To the extent that no single officer violated Mr. Harris' constitutional rights, the Sheriff/County/MCSO and Turn Key are still liable under a theory of a systemic failure of medical policies and procedures as described below. There were such gross deficiencies in staffing, facilities, equipment  and procedures, at the Jail, that Mr. Harris was effectively denied constitutional conditions of confinement.

34.     County sheriffs may be held liable for the maintenance of an unconstitutional health care delivery system. As devised by the Sheriff, the Jail has no functioning medical delivery system, ensuring that detainees with serious and/or complex medical or mental health needs, like Mr. Harris, will be deprived of constitutionally adequate medical and mental health care.

35.     The Sheriff maintained a policy or custom of insufficient medical staffing, resources, and training, chronic delays in care and indifference toward medical needs at the Mayes County Jail.

36.     At all pertinent times, there was systemic failure of medical policies and procedures at the Jail.

37.     At all pertinent times, there were such gross deficiencies in medical staffing, facilities, equipment, and procedures that Mr. Harris was effectively denied access to adequate medical care.

38.     As a matter of policy practice and custom, the Sheriff failed to staff the Jail with qualified professionals, failed to provide reasonable access to a physician and emergent medical care and failed to supervise the Jail's medical delivery system.

39.     It is believed that Defendant Turn Key is the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Cleveland County, Oklahoma County, Creek County, Tulsa County, Muskogee County, Garfield County, Ottawa County, Pottawatomie County, and Mayes County.

40.     Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Mr. Harris's death, the County/MCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Mr. Harris, who suffer from serious and complex medical conditions.

41.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

42.     Under the Contract in effect while Mr. Harris was housed at the Jail, Turn Key was responsible to pay the costs of all pharmaceuticals at the Jail up to a set amount per year (both prescription and over-the-counter). If the annual pharmaceutical costs exceeded this limit, MCSO/Mayes County was responsible for the excess costs.

43.     Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to a set amount per year, and MCSO/Mayes County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

44.     The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

45.     These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

46.     These financial incentives create risks to the health and safety of inmates like Mr. Harris who have complex and serious medical and mental health needs, such as heart disease and blood clotting disorders.

47.    Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

48.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

49.    These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, such as bipolar disorder, schizophrenia, catatonia, dehydration, malnutrition, hyperthyroidism, and heart disease.

50.    Decisions related to the assessment and treatment of Mr. Harris were largely made by LPNs who failed to refer Mr. Harris to a physician or offsite medical provider for a medical assessment.

51.    Indeed, Mr. Harris was never medically assessed by a physician, PA, NP, or even RN.

52.    Mr. Harris was also not provided with his medications, as prescribed, to address his obviously serious medical conditions.

53.    Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs. Mr. Harris' vitals were not taken after May 21, despite his rapidly deteriating condition.

54.    Even on the rare occasions Turn Key staff takes vital signs from inmates with complex and serious medical and mental health needs, like Mr. Harris, Turn Key has an

established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

55.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

56.    Turn Key's corporate policies, practices, and customs, as described *supra*, have resulted in deaths or negative medical outcomes in numerous cases, in addition to Mr. Harris.

57.    In November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain injections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

58.    Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery.

59.    He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a serious of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

60.    Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

61.     In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

62.     On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

63.     An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

64.     Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.  Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated.  Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on

his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

65.　　In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then ***while in <u>jail</u>, he deteriorated significantly and his <u>clinical deterioration went unrecognized and untreated</u> until he was nearly completely quadriplegic.***

66.　　On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

67.　　Like Mr. Harris, Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

68.     Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

69.     In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail jailers were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

70.     On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

71.     During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition.  During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

72.     During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

73.     Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

74.     Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

75.     By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

76.     At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

77.     Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

78.     Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Mr. Phelps any medications during his time at the Jail.***

79.     On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

80.     Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

81.     At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

82.     Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk,

14

stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

83.     At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

84.     APRN Martin noted that Plaintiff had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician.***

85.     Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

86.     Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

87.     Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

88.     Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

89.     From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of

those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

90.     In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

91.     In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

92.     Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

93.     By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

94.     ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

95.    On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

96.    Mr. White died on July 30, 2022.

97.    April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

98.    Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

99.    Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

100.    Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

101.    In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

***DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.***

102.    Yet, Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

103.    After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … **she looks like a skeleton."** Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that **medical (in the Jail) wasn't providing her care enough."**

104.    Another staff member told an investigator that Ms. Sullivan deteriorated **"to a bag of bones."**

105.    On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

106.    On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

107.    Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

108.    Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

109.    In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

110.    On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

111.    On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

112.    In response, Nurse Stehr called a Turn Key NP, **_whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition_**.

113.    On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

114.    Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

115.    After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

116.    Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

117.    On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

118.    On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

119.    In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

120.    Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

121.    On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

122.    In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

123.    On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

124.    Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

125.    On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

126.    Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

127.    Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

128.    No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

129.    Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

130.    The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

131.    Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

132.    On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

133.    Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

134.    Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

135.    Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

136.    Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

137.    For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

138. On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

139. Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

140. Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

141. From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

142. Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

143. In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

144. The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

145. The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as "acute dehydration and malnutrition."

146. For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

147.     On December 24, 2021, Dean Stith, a 55-year-old Black man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

148.     Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced - false reporting of a crime – were the result of symptoms of his dementia.

149.     During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

150.     Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

151.     On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication regimen and was "A&O [alert and oriented] to person and place only. Patient *__has 2+ pitting edema to BLE with multiple open areas…[1]__* Patient to wear compression hose but is noncompliant."

152.     On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

---

[1]     Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

153.    Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

154.    On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

155.    On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

156.    Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

157.    By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

158.    At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith ***"drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,[2] 2+ pitting edema to BLEs, and full body weakness."*** Nurse Lewis also noted that Mr. Stith was ***unable to urinate***.

---

[2]    A decrease in skin turgor is a late sign of dehydration.

159.     Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

160.     On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

161.     EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail *__health care staff are poor historians__* and are unsure of timeline."

162.     The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

163.     Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

164. The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[3] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

165. In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

166. By its design, the Turn Key medical system was destined to fail.

167. At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key. In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

168. In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to each of jails for short blocks of time. This constitutes plainly insufficient medical staffing.

169. With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training and licensure.

---

[3]   Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

170. In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Mayes County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Mr. Harris, with complex and serious medical and mental health needs.

171. With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

172. This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Mr. Harris, at substantial risk of harm.

173. This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

174. MCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Harris at excessive risk of harm. However, MCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Harris.

175. Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

176. This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

177. Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Harris.

27

## CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

178.    Paragraphs 1-177 are incorporated herein by reference.

**A.    Individual Liability and Underlying Violation of Constitutional Rights**

- **Failure to Provide Adequate Medical Care**

179.    Mr. Harris had obvious, severe, and emergent medical and mental health needs made known to MCSO/the County and Turn Key, including Defendants Black and Lawhorn (and the other Turn Key nurses on duty).

180.    Nonetheless, MCSO/the County and Turn Key, including Defendants Black and Lawhorn (and the other Turn Key nurses on duty), disregarded the known and obvious risks to Mr. Harris's health and safety.

181.    As described *supra*, Mr. Harris had serious and emergent medical issues that were known and obvious to the Turn Key/MCSO employees/agents. It was obvious that Mr. Harris needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed, and obstructed. Turn Key/MCSO employees/agents, including Defendants Black and Lawhorn (and the other Turn Key nurses on duty), disregarded the known, obvious, and substantial risks to Mr. Harris' health and safety.

182.    In deliberate indifference to his serious medical needs, health, and safety, Defendants failed to provide Mr. Harris with, *inter alia*, timely or adequate medical or mental health treatment; proper monitoring and supervision; or reasonable access to outside medical providers

who were qualified and capable of evaluating and treating her while she was placed under their care.

183.    As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, including Defendants Black and Lawhorn (and the other Turn Key nurses on duty), Mr. Harris suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, and medical expenses.

### B. Municipal Liability (Against Turn Key)

184.    Paragraphs 1-183 are incorporated herein by reference.

185.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

186.    At all times pertinent hereto, Turn Key was acting under color of State law.

187.    Turn Key has been endowed by Mayes County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

188.    Turn Key is charged with implementing and assisting in developing the policies of MCSO with respect to the medical and mental health care of inmates at the Mayes County Jail and has shared responsibility to adequately train and supervise its employees.

189.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

190.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Mr. Harris' serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

191.    To the extent that no single officer or professional violated Mr. Harris' constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and

procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Mr. Harris was effectively denied constitutional conditions of confinement.

192.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Harris.    Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Harris's, serious medical needs.

193.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

194.    Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Mayes County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

195.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Plaintiff's injuries and damages as alleged herein.

### C. Official Capacity Liability (Against Defendant Sheriff)

196.    Paragraphs 1-195 are incorporated herein by reference.

197.    The aforementioned acts and/or omissions of MCSO and/or Turn Key staff in being deliberately indifferent to Mr. Harris's health and safety and violating Mr. Harris's civil rights are causally connected with customs, practices, and policies which the Sheriff/County/MCSO promulgated, created, implemented and/or possessed responsibility for.

198.    Such policies, customs and/or practices are specifically set forth *supra*.

30

199.    The Sheriff/County/MCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Harris', health and safety.

200.    The Sheriff/County/MCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

201.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Harris suffered injuries and damages as alleged herein.

202.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

## NEGLIGENCE
### (Against Turn Key)

203.    Paragraphs 1-202 are incorporated herein by reference.

204.    Turn Key is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

205.    Turn Key is not an "employee" of CCSO under the Oklahoma Governmental Tort Claims Act ("GTCA") and is not otherwise immune from liability under Oklahoma law.

206.    Turn Key, through its employees and/or agents at the Mayes County Jail, including Defendant Lawhorn (and the other Turn Key nurses on duty), owed a duty to Mr. Harris, and all other inmates incarcerated at the Mayes County Jail, to tender medical treatment with reasonable care, taking caution not to cause additional harm during the course of medical and/or mental health care and treatment.

207. As described herein, Turn Key, through its employees and/or agents, including Defendant Lawhorn (and the other Turn Key nurses on duty), breached its duty to Mr. Harris, by failing to provide competent and timely medical health care and treatment as required by applicable standards of care, custom and law.

208. Turn Key staff, including Defendant Lawhorn (and the other Turn Key nurses on duty), failed to provide adequate or timely evaluation and treatment, even as Mr. Harris' known medical conditions deteriorated. Agents and/or employees of Turn Key failed to reasonably or timely treat Mr. Harris's serious medical conditions, and prevented his timely transfer to a medical facility for emergent care.

209. Turn Key's negligence is the direct and proximate cause of Mr. Harris' physical pain, severe emotional distress, mental anguish, medical expenses, and the damages alleged herein.

210. As a result of Turn Key's negligence, Plaintiff is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit,  punitive damages for Defendant Turn Key and its employees' reckless disregard of Mr. Harris' rights, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
SMOLEN & ROYTMAN
701  South Cincinnati Avenue

Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

-and-

Brendan M. McHugh, OBA #18422
P.O. Box 1392
Claremore, OK 74018
Tele: (918) 608-0111
Fax: (918) 803-4910

***Attorneys for Plaintiff***